Now calling case number 16-5282, Timothy Mayo Ken Nelson for the appellants, Michael T. Reynolds in his official capacity as Acting Director of the U.S. National Park Services et al. Mr. Glittenstein for the appellant, Mrs. Marone for the federal appellees Mr. Peterson for the intervener appellees Good morning. The sole issue now on appeal involves the government's compliance with the National Environmental Policy Act in connection with its annual decisions as to whether and on what terms to authorize hunting of elk in the Grand Teton National Park. NEPA, if I can use the acronym with the Court's permission, requires that the statutory directive to address impacts be considered to the fullest extent possible. In this Court's seminal decision in Calvert-Cliffs, the Court defined that as demanding that environmental issues be considered at every important stage of the decision-making process concerning a particular action at every stage where an overall balancing of environmental and non-environmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs. In this case, there's no dispute that the National Park Service not only does but by statutory command must make discretionary decisions every year as to whether and on what terms to authorize hunting of elk in the Grand Teton National Park. Of course, everyone recognizes that ordinarily there is no hunting, recreational hunting, which essentially is what this amounts to in a national park. But there was, in fact, built into the Grand Teton statute. There is no dispute and authorization for the National Park Service to make what the Park Service has acknowledged are discretionary decisions. The Park Service has acknowledged that its determination of whether to authorize hunting is discretionary. Page 622 of the Joint Appendix specifically says it is not mandatory and that they must make a new decision every single year. In fact, even the 2007 plan and underlying programmatic EIS acknowledge repeatedly, and these are just a couple of the places in the Joint Appendix where they say that they can only allow hunting when it is quote-unquote necessary as determined in any particular year. Joint Appendix 244, 633, 634, 642, 678, page 259. And so they do make these determinations every single year and they are discretionary. And on some level, I think the question for the court is not why should they do NEPA review, but to turn it around to some degree, why shouldn't they do NEPA review when they admit they're making new decisions every single year and they do, in fact, bring some level of analysis and expertise to bear when they decide how many elk will be killed, where they will be killed, what conditions will be placed upon the hunt, and a host of other circumstances which, in fact, arise from year to year. Now, they did in the 2007 plan address this hunting and its environmental impact. And why don't you have the burden of showing that there's something significant that has changed in the environmental consequences of the hunting to necessitate a new NEPA? It's not whether they have to address it at all. Their position, as you know, is that they did address it. And these logistical decisions they make each year don't implicate new environmental consequences. Do you have an answer to that? Yes, Your Honor. As you know, one of our answers is that they're actually not carrying out the 2007 plan as they represented to the court and as they said they would. As to hunting, they're not carrying it out? Well, I think the hunting was part and parcel of the overall programmatic action. No, but what has changed as to the hunting and the environmental consequences of the hunting? Well, I think there have been, and every year there are changes made, both in terms of exactly how they authorize hunting as well as some of the impacts that have come to the fore. But I do also want to come back to the point that- Can I freeze you there for a second, Bill? With apologies, and I'll let you get back to your point. Yes, Your Honor. As to those things, where, and the consequences of the hunt, do you allege that those have unforeseen, unconsidered environmental consequences by themselves? I think so, Your Honor. For example, one unforeseen consequence was the killing of a grizzly bear, which occurred notwithstanding the fact that the plan and the EIS specifically said that they did not believe that there would be any deaths of grizzly bears. And in fact, as Your Honor knows from other parts of our case, which has since become moot ESA part of the case, Endangered Species Act part of the case, they had to go back and increase the authorization for grizzly bear pay because of that development. I can address that, but is there something else? So there is that development. In addition to that, they have done various things to address environmental impacts that have come to the fore. For example, we refer to quote, unquote, major changes that they've made in the hunt, one of which, for example, was to eliminate lead shot, which was an impact that was not specifically addressed in the 2000 EIS. They implemented changes in how the hunt would actually be. Were they somehow bound by the prior decision not to make that change? I mean, obviously they're going to be, in a 15-year program, they're going to be mid-course corrections, right? I mean, that's got to be the case, right? I agree, Your Honor. And let me, I think that's, if I could just sort of focus in on that, and I think that helps answer both that question and the question about what happens year to year. This gets to the whole concept, I think, of tiering under the NEPA implementing regulations. Addressed in Theodore Roosevelt, as you know, they're not bound, absolutely, assuming they're complying with the plan, which is a central part of our argument that they're not. But even if you took the 2007 plan at face value, it doesn't foreclose the need to look at variations and modifications that are made from year to year. In fact, it specifically contemplates that those kinds of variations and modifications will be made. So argument is not that every time they look at a new hunting decision, assuming they're in compliance with the 2007 plan, that they have to revisit every element of this broad planning document. I completely agree with that, Your Honor, as a matter of conceptual NEPA compliance. But under the CEQ regulations implementing NEPA, as well as under the case law, and we think this is also clear from the Theodore Roosevelt case itself, that when they implement the plan, especially a broad plan which commits itself to adaptive management, it has these very broad, amorphous kinds of parameters. When they make new decisions, especially statutorily required decisions, that make exactly the kinds of variations that Your Honor is referring to, then some additional NEPA review is called for. And let me just be clear about what kind of NEPA review could be compliant in a scheme like that, because this is not, I don't think, any kind of a draconian or dramatic suggestion I'm making. Many agencies, we refer to this in our reply brief, have a broad programmatic document, Migratory Bird Treaty Act, for example. It has a broad document where it talks about overall decision making on how many migratory birds will be killed each year. But every year, when it makes exactly these kinds of modifications and variations, how many will be killed, where that can happen, they prepare environmental assessments on those individual decisions, which then address what are the impacts of those particular mitigation measures. Did they go far enough? Are there alternatives to those? And so even, I think, if the scheme were being implemented, it does not foreclose under the statute and the regulations. It certainly does not render non-possible additional NEPA review. And I think this is also a... Well, what is your test? I mean, it can't be that every change, even if referenced in a statute in a 15-year plan, requires this either tiered or supplemental NEPA that you want. If they went from 600 hunters one year to 585 the next year, that itself, I assume, would not require NEPA analysis. So what is your test for identifying which changes trigger an obligation when they've already addressed the environmental concerns of hunting in the original 2007 plan NEPA? What is the test for which changes require new analysis? Well, I think one critical part of the change, Your Honor, which is important in this case, it does not exist, I think, in any other case the government has relied upon, with the threshold obligation to make a decision every year as to whether hunting is even necessary. If you look at the statute, it refers to a recommendation on whether or not to have a hunting program for conserving the elk, which is supposed to be the objective, and then a decision every single year about whether that, as opposed to some other alternative. With respect, I think there are a lot of plans that agencies issue in the environmental area and elsewhere that will require decisions to be made annually, but we don't require every implementation decision that has to be made annually to be subject to NEPA review again. I had thought our test was that there had to be a significant impact, significant environmental consequences that were not previously addressed. Is that not the right test, and if it isn't, what is, and what's your authority? Well, I think the way to look at it, I mean, we do think there have been significant changes in terms of Is that the right test? Well, I think that my view is that even if there's not a significant change, when there's a new decision that has to be made every year about whether or not this particular approach should be conducted, and, in fact, in terms of changes, it could be changes in justification for the hunt. So, for example, Your Honor, and try to be more responsive to your question, here this acknowledgment that the state of Wyoming has now hit its 11,000 population target. When the plan was issued, they said that the major effort, or one of the major objectives, was to get down to an 11,000 population number, and the hunt was part and parcel of getting down to that number. Well, now they admit that they've reached the number 11,000, and we have a statute which, on its face, says that you have to determine whether or not there is a need for a hunt in any particular year, and then we have the Park Service saying, in so many words, our desire is to regulate naturally in a park as much as we can. So, in answer to your question, I think there have been impacts like Grizzly Bear Impact and acknowledging lead shot as a problem and other things, but there's also a change in terms of whether or not the justification exists. I just want to get back to it, because we have to decide a case based on legal rules that don't just apply to this one plan. So what is the test for when a change? How would you articulate that legal test in a way that would apply not just in this case, but in future cases that involve long-term plans? I think the test involves a combination of are there changes in circumstances and facts that address either impacts that vary from year to year, which I think is clear here, potentially significant and in fact what the agency itself called major changes in its regulatory scheme over time, as well as, importantly, the justification, the rationalization for that action from year to year. What about the part of the test not previously addressed? Correct, Your Honor. You didn't say that. It's previously addressed. I mean, you're just using impacts, but there's discretionary decision-making that occurs. Your argument seems to be, in fact it was when you started out, why not? That's not the test. That can't be the test. Why not? What's to lose if they do it? Well, there's a lot to lose, actually. The agency may say we can't spend this time each year doing this. We've assessed it. We've assessed all of the underlying issues. We've given it our best shot, and now we're going to make discretionary decisions going forward. Well, I didn't mean to be overly flippant about the why not. No, you weren't being flippant, but it was a strong point. I kind of perked up. That was your point. Why not? What's the harm? Which is, you're correct, why not, but that's not the test. Well, I agree, Your Honor. When I meant why not, I meant there was a new action every single year. Right. It's a discretionary decision. Right. It's site-specific decisions that could not and were not made when the programmatic EIS was issued, which dealt with this broad adaptive management framework. And so when I said why not, the question was really more in terms of what NEPA requires, which is analysis on every federal action which occurs that had not previously taken place. And I think part of the answer also is, again, I was trying to suggest that the tiering concept, even if you don't have what's considered to be a major new change, the concept behind tiering is that when you make more particularized decisions that were within the scope of the overall program but were put off until a later time. But weren't analyzed. To be analyzed. And I think that's what the programmatic EIS committed the agency to doing. It said we were going to have these new decisions when necessary every year. And so we think there have been changes, and they recognize that there would have to be a new justification based upon circumstances as they evolved. And, again, I think going to this core question about even the rationale for the hunt, the 11,000 population target has been met. So the question in any year is. Well, they say the gender distribution isn't what they wanted. Well, that was an initial recommendation. If you look at the underlying programmatic EIS, they said our initial recommendation was the 35 to 100 ratio. Well, this is exactly the kind of question, notwithstanding the fact that we've met the overall population objective, that we still need a hunt as compared to other ways of regulating. The other thing I would raise in this connection is, ironically enough, the recent grizzly bear delisting raises the question about whether or not natural regulation would be a more effective approach, consistent with the purposes of the national park system. In your brief, you seem to focus on the fact that the amount of supplemental feeding going on was at the high end of what was anticipated at the time of the original EIS, which I think is true. But the district court found, and I didn't see your brief responding to this, that there's no indication of the record that the fact that a larger herd segment is wintering in the refuge has had a spillover effect on the environmental impact of elk hunting in the park. That would seem to be central. In other words, does that development or non-development, however you want to characterize it, change the valuation of environmental impacts of the hunting itself? I think it does, Your Honor, because part of the rationale for the hunting was that they wanted to reduce the population, and the population was then going over to the refuge. And the fact that they haven't implemented that part of the plan is used as a justification for continuing hunting. So it's a continuation of an activity that they said to this court quite clearly they were going to change the dynamic. There's also a flip side of that. Is the number of elk hunted actually gone down, even as the feeding hasn't? And that calls into question the entire rationale behind the plan. No, but I'm just asking as an empirical matter. I think as a factual matter they have allowed less hunting. That's correct. Which would have been what one would have hoped from feeding reductions to have happened. So the hunting impacts have gone down, notwithstanding the fact that the feeding has not. Well, the number of elk killed have gone down somewhat. Authorized to be hunted. Although the last couple of years it's remained somewhat stable. That's correct, Your Honor. I mean, the impacts overall continue to be substantial in terms of other users and impacts on other wildlife. I see my time is up. The reduction from the hunting presumably has declined because the hunting has declined. Well, the hunting has declined. If I could make one other point about the relationship in answer to Judge Williams' question. Because it does also raise the question about the impact of the hunt on the refuge itself. Because in various places in the record, the Park Service acknowledged that if you reduced the amount of hunting, you might actually keep more elk in the park and you would have less elk go to the refuge, which was the central objective of the plan. And the fact that they're not meeting the objective in the plan in order to reduce the harmful concentration of elk, I think reinforces the fact that this was all seen as an overall dynamic framework that they're clearly not implementing and itself warrants some additional deeper review. So in that respect also we think there's been a significant change that would warrant a supplemental EIS. If there are no further questions. Thank you.  Good morning, Your Honor. My name is Rachel Heron on behalf of the federal appellees. With me at counsel's table is Eric Peterson for Intervenor State of Wyoming and Anna Seidman for Intervenor Safari Club. If it's agreeable to your honors, I will use 12 of the 15 minutes that were allotted to the appellees. Wyoming will take the remaining three. Counsel for Safari Club will not present argument but is available should the court have any questions for the club in particular. As the appellant conceded, there is only one issue now live in this appeal, and that is whether the National Park Service satisfied NEPA when it applied previously selected management criteria to determine whether and how many deputized hunters would be authorized to remove elk from Grand Teton in a given year. The agency did satisfy NEPA. And if I could, I'd like to start by providing a little bit of context for the format and the procedure that the agency followed here. As this court has recognized, NEPA requires agency to take a hard look at the impacts of their decisions. But when it comes to a decision or an agency project that's going to have multiple stages, it leaves to the agency to decide whether it's going to look at all of the foreseeable impacts from those multiple stages in a single environmental analysis document or whether it's instead going to create a broad document and then tier with a series of subsequent more specific documents. And the appellant has pointed out various scenarios in which agencies have chosen to do the tiering approach. But agencies also frequently choose to look at all of the steps in a single document, and there's nothing suspicious about that. For example, the court doesn't need to look any farther than its own decisions in Grunewald and in Davis to cases that were cited in the briefs, which involved National Park Service projects to pull the number of deer in certain national parks. Both of those environmental impact statements looked at decisions that would take place over numerous years to bring the level of deer in these park properties down to certain levels. Well, I think what they would say is, look, we're two-thirds of the way into this 15-year plan here, and the central basis on which the plan was made and the analyses were undertaken was that supplemental feeding would decrease. Not a hard and fast deadline for stopping it, but that was the trajectory, and that was the trajectory on which the environmental analyses were undertaken. And it just hasn't happened. And so when agencies choose to do these longer-term plans, and maybe they choose at the front end to do their best job to analyze the impacts, but the central premise, the central predicate for the analyses just not only isn't happening, but feedings are going in the other direction, at what point does the agency at least have to stop and go, this isn't going as planned, we need to take a second look? What should the test be for that? Your Honor, I think that the test is the test that this Court articulated in Davis, which is that not every change requires a supplemental EIS, but, quote, only those changes that cause effects that are significantly different than what was already studied. And here the question is whether the effects of the program that's being challenged, the hunting decision in Grand Teton, is having any significantly different effects. And I think Judge Williams pointed out that the district court found that whatever alleged changes are happening in the program on the refuge with regard to supplemental feeding isn't having demonstrable spillover effects on the hunt itself. And, in fact, the numbers of hunters authorized on the park every year is going down, such that the impacts from hunting, if anything, may be a bit less severe or significant. Is the number of elk hunted also going down? The number of elk that are actually hunted varies from year to year. It usually turns out to be something around maybe 25% or a third. So as the overall number of hunters authorized is going down, that number is generally going down but not sort of in lockstep because in any given year people may have more success. Well, this authorization of hunting each year turns on a determination of necessity. And I think their argument is that the necessity wouldn't be there but for the fact that the central feature of this plan has gone haywire. And so how can we determine that this hasn't had a significant impact, the increased feeding hasn't had a significant impact on your determinations that hunting is still necessary or hunting is still necessary at the level that it's continuing? Well, with respect, Your Honor, I think the question of necessity really goes to the substance and the policy of the decision rather than NEPA. The NEPA question is whether something about the supplemental feeding is causing the impacts of hunting to be different. With regard to whether there's a need for the hunt every year, the plaintiff or any other member of the public is free to bring a cause of action and say, hey, look, in light of all this other stuff that's going on, your necessity determination is arbitrary, it's capricious, it doesn't make sense. And, in fact, the appellant did bring a cause of action regarding necessity for the hunt below but didn't carry it over on appeal. I think when we're looking at NEPA, what matters is whether the impacts are different. And the appellant has simply not pointed out any impact from the hunt itself. Would different include being continued longer than anticipated? No, there's just some adverse environmental consequences. And the fact that they're being continued longer for more years than would have been anticipated in 2007, why doesn't that need to be looked at? Or how do we know that doesn't need to be looked at? Sure. So I think that in the scenario you posit, there could very well be a need for supplementation. But here, and I would point, Your Honors, to JA-285 and JA-565, which is the 2007 EIS's projections of long-term, which is defined as 15 years plus out, hunting on the refuge. And it says that it expects over the long-term authorization of 770 to about 950 hunters each year. So this is simply not a case in which the expectation was that this program was going to result in hunting tapering off to nothing by the end of this plan. It expected that there would be an increase at the beginning, and then that would taper down, but taper down to about 750 plus. And in fact, hunting currently is occurring at about 650 plus. So it's simply not the case that any changes in supplemental feed are causing hunting at a scale that wasn't anticipated in the EIS. Certainly, it's maybe contributing to hunting that's more than a pellant would like it to be, that's more than it might be if the numbers on the refuge were going down, but it's not more than the EIS considered. And that's the important question for NEPA. The decrease in feeding in and of itself is not the goal, right? A decrease in feeding is not the goal of the plan. Sure, the long-term goal... I mean, it's interesting the other side did not raise the feeding in his argument until the very end when asked, which was interesting in light of the briefing, because there is no challenge to the feeding. That's absolutely right, Your Honor. If the fight here is over the hunt, then I think your argument is our goal in the plan, we said some things about feeding, but our goal in the plan was to get the hunting numbers down and where we expect it to be. Am I understanding the record correctly? That's right, Your Honor. So the feed is this kind of interesting aside that's playing big, but I'm not getting how it's playing that importantly because that's not their challenge. There's no arbitrary and capricious challenge here. Their fight is over the hunt, and the hunt numbers are down. I think that's right, Your Honor. That's the way we see the case. I mean, I think that there is, to the extent that there are concerns about what's going on on the refuge and the level of feed, a challenge could be brought against the refuge or could say that the refuge needs to do additional NEPA analysis with regard to the amount of feeding that it's doing. And in that kind of case, there would be the refuge's participation, there would be a record demonstrating exactly what's going on over here, whereas here we have a case that's all about hunting, the record is all about hunting, and there's been no demonstrated change in hunting that's going on. So I do agree that I think the sort of discussion of feed is really a bit tangential to the case that the plaintiff actually brought here. If there's been a demonstrated change in hunting, the number of authorized hunts and the number of kills has gone down. I apologize. It's not that there's been no change. You don't have to apologize. It's pretty important for your case. Fair enough, Your Honor. It's not that there's been no change. It's that there's been no deviation from the trajectory that was expected. On the supplemental feeding, my understanding is the EIS was inconclusive as to what the range would be of supplemental feeding, and nothing has happened. It may have been a surprise to a degree that it's toward the high end of what they expected, but there's no indication it's beyond the high end of what they expected. Is that correct? I think that it's certainly correct that the EIS didn't say hard and fast supplemental feeding is going to reach this number. It chose a phased approach where the amount of feeding would go down over time, hopefully as the number of elk on the refuge went down over time. The alternative that was chosen here is different than other alternatives that were considered in the plan where the agencies had proposed driving the number of elk that are receiving supplemental feed down and trying to control the population in that way. That's another way of handling this. It's not the way that was ultimately chosen. And I do think that on this issue of supplemental feed, to the extent there's any concern that there's some relationship between supplemental feed and the effects of the hunt, I think it's important to keep in mind that the 2007 EIS does look at the effects of supplemental feed and does characterize exhaustively this idea that as you do have more feed, that is going to result in certain risks to the elk population. So it's not as if the agencies are unaware of what it potentially means for those numbers to be going up. But, again, here when we're dealing with the hunt and when we're dealing with an agency, a challenge to an agency that only has control over the hunt, the discussion that's in the EIS on supplemental feed and the fact that the hunt numbers are as the 2007 EIS thought they would be, really is a sufficient discussion of NEPA to satisfy NEPA. And for that reason, there's, in our view, no reason to require additional analysis at this time. And just to clarify, the number of hunters has gone. Has the number of elk killed by hunters gone down? It has generally gone down. Okay. And then just one last quick question. Do you dispute their claim that muntin ware vacature is appropriate of the district court's ESA holding? We don't oppose vacature here. If Your Honor doesn't have any questions, I know I've gone a little over time, but I'd like to make sure that Wyoming gets its opportunity as well. Okay. We'll give them their time. Thank you. Good morning, Your Honors. Given Sharon's thorough approach, I just want to make two brief points. Going back to the question of, I believe Judge Esper referred to it as the why not question, I would just direct the court to Wyoming's brief at page 34, where this court's own words explain the answer to the why not question, which is that, quote, NEPA's rule of reason does not demand rethinking of everything all the time. It would be absurd to require an EIS on every decision on the management of federal land. The courts cannot allow NEPA to be bloated and, indeed, enfeebled by pushing the logic of NEPA's requirements to ridiculous extremes. The second point, a minor one, is Mr. Glitzenstein made a reference to the potential effect of the Grizzly delisting. Of course, that is not in front of this court. It postdates all of the decision-making that is relevant. And you don't dispute the Munson-Weber vicature is appropriate either. Wyoming will follow DOJ on that, Your Honor. Thank you. Thank you. Does Mr. Glitzenstein have any time left? No. We'll give you two minutes. Thank you. Just get some citations and one, I think, response that I didn't hear, and that is that the state's objective of $11,000 has been satisfied. And so even though we think the record does show increasing conflicts and the service itself has acknowledged that, according to appendix page 744, they say we have and expect continuing conflicts with other park objectives by having the hunt. I think the most critical fact today is they have not given a justification for the continued hunt at all under the plan. And so if you've met the objective and the statute requires you to consider every single year whether or not there are alternatives, which could include natural regulation, then there is obviously a critical dimension to NEPA compliance, which was not addressed in the plan. It could not have been because the plan provided that a hunt, as well as other features of the plan, would be contingent upon having to meet population objectives that have now been satisfied. Do you have the ability to just bring an arbitrary and capricious challenge to a hunt authorization as not necessary as opposed to a NEPA claim? Your Honor, those could be brought. It sounds like your argument is it's not necessary because they've met their 11,000. They'll have their answers, no doubt. But that argument sounds different to me than in NEPA. Something's missing in the NEPA analysis. I don't think it is because I think what the government and Wyoming have not responded to is that a critical aspect of NEPA compliance is the consideration of alternatives that could avoid adverse environmental impacts. So even if the hunt has leveled off on some level, even in their plan they admitted there were all kinds of adverse impacts from any hunt at a national park. Other visitors are impacted, wildlife like grizzlies is impacted, and the critical focus of NEPA compliance is alternatives consideration. Is it impacted more than the impact they anticipated in 2007? I think on some level, yes, that their own document, 744, acknowledges that at least with grizzly impacts and other major changes they had to make, there were increased impacts. On supplemental feeding, didn't they consider the option of just cutting it off totally? They did consider the option of cutting off supplemental feeding, Your Honor. Which obviously would have solved that particular issue. And then they found it more suitable to go forward because it's option four, which did not invoke such a solution. With the obvious probability that the supplemental feeding would continue and might continue without reduction. Your Honor, actually, if I could just give you the citation on that, page 682 of the appendix, the Park Service said, the preferred alternative clearly states that the Fish and Wildlife Service intends to progressively reduce the use of supplemental feeding. This court, in oral argument, took the government at its word that this meant end supplemental feeding over the course of time. That was the centerpiece of the plan. The opposite has happened. We have more feeding on the refuge now than was occurred before. But that's not the challenge here. The challenge is to the hunt. You have another way to challenge the supplemental feeding, and I'm not even sure it's this agency. Your Honor, I understand that concern. It's a huge concern. The supplemental feeding was made the core of the plan. It doesn't matter. If that's not the issue before us, and this is not the agency that can respond to that question, I understand that you feel strongly about it, but not strongly enough to raise it in your opening presentation until we raise the question. But that just confirmed for me you understand it's not before us, and this isn't the agency that can correct that. Well, if I could respond briefly to that, Your Honor. I think our race do heavily hit on it. I mean, if I didn't respond to it enough in the opening. It was a shock to me, even though I still would have had questions for it. It was a shock for me. You had nothing to say about it until questioned by one of my colleagues at the very end of your argument. If that's at the heart of what you mean to say, there's no way. You're a good counsel. There's no way you wouldn't raise it because you knew you can't hopefully go there, right? This is a hunt case. Your Honor, if I could just bear with me for another moment. It's a hunt case, but I should probably have raised it more in my opening. That was a mistake on my part. But if I could attempt to respond, because it wasn't because we don't think it's important. I was trying to respond to the questions about what happens every year and the justification for the hunt. But, Your Honor, the critical point is that relies on the plan. The plan's objective to get to 11,000 elk in turn was dependent upon reducing the number of elk on supplemental feed. These were all presented as coordinated parts of one program, one plan. And so I apologize if I did not adequately address that in my opening. I think our briefs do make it clear. And it wasn't because we don't think. I agree that hunting is the focus. But hunting was part and parcel of a coordinated plan that was presented as such. And that if you're not implementing the plan, and particularly if you've met your population target, even though the refuge numbers have gone up, I go back to the same crucial question is why are we having a hunt? And NEPA is all about alternatives. Does this agency control the supplemental feeding? No, but it can make a decision about whether or not hunting should continue in light of the fact that the plan that was underlying the rationale for hunting. So this is kind of a third-party action. You want them to make a decision on hunting, which will force the agencies that have the authority to control feeding to do something. Your Honor, could I just emphasize? The Park Service issued the plan, too. The Park Service was a co-author of the plan. So they signed on to a plan where they said, point blank, repeatedly, the core of this is reducing supplemental feeding. Part and parcel of that is the hunt that we're going to do. And so the question then is if we're not doing the plan that the Park Service itself signed off on, why are we implementing a hunt which was contingent upon that as the central focus when that's not happening? So I apologize for not being as clear and direct on that issue as I should have been at my opening. But it is an important part of our case, and we think the supplement to the EIS standard is satisfied here. Thank you. Thank you very much. The case is submitted.
judges: Millett, Edwards, Williams